**Richard DOWNS, Plaintiff/Appellant,**

v.

**CNA INSURANCE COMPANY, Defendant/Appellee.**

Supreme Court of Tennessee, at Nashville.

Feb. 6, 1989.

Luther E. Cantrell, Jr., Davies, Cantrell, Humphreys & McCoy, Nashville, for plaintiff-appellant.

C. Hayes Cooney, John B. Carlson, Watkins, McGugin, McNeilly & Rowan, Nashville, for defendant-appellee.

OPINION

O'BRIEN, Justice.

The judgment in this workers' compensation case was appealed by the plaintiff due to purported error in the computation of disability compensation by the trial judge.

The fact of an on-the-job injury sustained in the course of employment is not disputed. Defendant was engaged in his employer's business, clearing a power line of overhanging tree limbs, when he fell some thirty feet to the ground from a bucket attached to an extended boom. He suffered extensive injuries to his left wrist and elbow. Internal injuries incurred were not significant to this case in that they were not the object of any workers' compensation claim.

Dr. David Gaw, an orthopedic surgeon, testified he first observed Mr. Downs in the emergency room of Southern Hills Hospital on 21 August 1985. X-ray examination disclosed he had a comminuted fracture of the radial head in the elbow section of his left arm and a comminuted fracture of the distal radius in his left wrist. It was determined that the upper part of the radius, the radial head which moves the elbow joint, was broken into several pieces and could not be repaired. The bone was replaced with a Silastic Prosthesis which is a specialized rubberized material used for such purposes. The wrist part of the radius bone which articulates with the bones of the wrist was shattered. This was set by drilling through the bone of the hand and setting pins. Pins were placed through the bone of the ulna, halfway between the wrist and the elbow. Traction was put on the fingers and the elbow to distract the fracture and keep it set. When the trac-

tion was accomplished a cast was put in place incorporating the pins inside the cast to keep the bones distracted, or pulled apart, to allow the shattered bone to heal in proper length so it would not collapse. On 3 September 1985 it was determined that the wrist fracture had lost position or collapsed, the bone had not remained set inside the cast. It was necessary to perform further surgery by putting a steel plate in the bones at the end of the radius. This operation was performed on 9 September 1985. Mr. Downs remained under observation and participated in physical therapy. On 15 October 1985 it was noted that he was experiencing pain along the little finger side of the wrist at the distal end of the ulna. Dr. Gaw explained that when a fracture occurs at both ends of the bone it disturbs or dislocates both joints since both ends of the bone are shortened, giving the effect of shortening the whole joint. The joint was subluxed superiorly or out of place at the top of the hand. Mr. Downs was not gaining any movement of supination, that is the ability to turn the palm of his hand upward. He was not able to move it past the neutral position. Therapy was continued in an effort to enable him to accomplish this movement. On 29 October 1985 examination disclosed he was still not gaining appropriate motion of his hand. Dr. Gaw had the impression that a screw which was turned into the bone in the original operation and had gone inside of the radial carpal joint may have been causing some problem. The ulna was dislocated superiorly, limiting supination. On 4 November 1985 a third operation was performed to remove the steel plate which had been inserted to fix the fracture. Following this operation Mr. Downs had slightly greater downward flexion of his wrist. He was still unable to turn his palm upward. It was necessary to turn his whole arm up into his shoulder in order to attain motion in excess of five (5) degrees. In December 1985, in consultation with Dr. Gaines, another orthopedic specialist, it was decided that Mr. Downs needed a fourth operation to remove the end of the ulna. In January 1986 he was experiencing less pain. He could still only turn his palm upward about

fifteen degrees. He had a little more dorsiflexion of his wrist and lacked only a few degrees of being able to completely extend or straighten his elbow. Dr. Gaw recommended he return to work as the best therapy for this extremity. His next observation was in August of 1986 when he noted that Mr. Downs still could not supinate his palm past neutral. He had problems at work, could not open a car door, comb his hair or do anything that required the arm to turn. He was experiencing more pain at the distal radial ulna joint. He had thirty degrees of volar flexion or holding the palm down and dorsiflexion or cocking the wrist up of ten degrees. He could turn his hand down completely. He could bend his elbow forward but lacked about fifteen degrees being able to completely straighten it. At the conclusion of this period of observation and treatment, including therapy and the three operations noted, Dr. Gaw concluded that the radial-ulna joint in the wrist was dislocated and the operation to remove the end of the ulna should be performed. He was of the opinion that Mr. Downs had reached maximum improvement at that point without the operation and suffered a thirty-five percent (35%) impairment of the left upper extremity. The recommended operation was performed on 17 October 1986. Approximately one inch of the ulna bone was removed. Mr. Downs continued with his therapy and exercises under occasional observation and on 18 January 1987 he was released to return to work. At that time the doctor noted he was making satisfactory progress, had less pain. He had about half of normal supination, about forty degrees. He still had limited dorsiflexion and could raise his palm up ten degrees. His impairment to the left upper extremity was assessed at twenty percent (20%) using the American Medical Association Guide to Permanent Impairment.

In his oral testimony Mr. Downs related the occurrence and nature of his accident and his subsequent treatment for his injuries. He confirmed his conversation with two of his employers when he was first released to return to work in January of 1986. He informed them he could not per-

form the job he was on at the time of his injury. He was advised there was no other work available to him. He proceeded to seek other employment. He worked on one construction company job in which he was required to use a pick and shovel digging a drainage ditch. He was unable to continue with this job due to the vibration which occurred when he struck a hard object in the ground with the pick. This caused a numbing feeling and a loss of strength in his arm. He resigned from another job because he was required to work on a high scaffold without safeguards, assembling air condition ducts. He became too nervous to work at that height. Other jobs included driving a delivery truck, and sorting mail. He had worked as a mail sorter about two (2) weeks when the final operation recommended by Dr. Gaw was performed. He had experienced difficulty at this job because of his injured arm but endeavored to return when he recovered from the operation. He was not re-employed. Ultimately he did find other work he could do. At the time of trial he was earning $6.00 an hour. This was the same salary he had been paid at Spiceland Tree Surgery Co. He explained his limitations at utilizing his arm in working, lifting, driving, etc. It was his estimate that at the time of trial he had suffered forty or fifty percent disability to his arm.

After hearing all of the evidence, the trial judge engaged in an exchange with counsel for the plaintiff and for the defendant about the degree of impairment assessed by Dr. Gaw. He discussed the matter of computation and the amount of disability rating to be fixed by the court. He considered Dr. Gaw's impairment rating of twenty percent (20%) and after noting that plaintiff had obvious severe limitations in the use of his arm, calculated his disability rating at twenty-five percent (25%).

■ We first consider the issue that the trial judge erred in assessing the degree of permanent partial disability. This accident occurred on 21 August 1986. The standard of review is de novo on the record, accompanied by a presumption of the correctness of the trial court findings unless the preponderance of the evidence is otherwise. T.C.A. § 50–6–225(e); *Alley v. Consolidation Coal Co.,* 699 S.W.2d 147 (Tenn.1985). "This standard of review differs from that previously provided and requires this Court to weigh in more depth factual findings and conclusions of trial judges in workers' compensation cases." *Humphrey v. Witherspoon Inc.,* 734 S.W.2d 315 (Tenn.1987). We are no longer bound by the findings of the trial court in these cases and now determine where the preponderance of the evidence lies. *Corcoran v. Foster Auto GMC, Inc.,* 746 S.W.2d 452, 456 (Tenn. 1988).

We are of the opinion the evidence preponderates against the trial court's judgment that plaintiff has sustained a vocational disability of twenty-five percent (25%). He stated for the record that the principal matters he considered in his calculations was the degree of physical impairment assessed by Dr. Gaw and the fact that at the time of trial plaintiff was not totally disabled to work. There is nothing in the record to indicate he considered any other factor. In *Bradford v. Travelers Indemnity Co.,* 762 S.W.2d 572 (Tenn.1988) this Court stated some of those things to be considered by a trial court in determining the extent of vocational disability:

"... [T]he trial court considers 'many pertinent factors, including job skills, education, training, duration of disability, and job opportunities for the disabled, in addition to the anatomical disability testified to by medical experts.' *Employers Insurance Co. of Alabama v. Health,* 536 S.W.2d 341, 343 (Tenn.1976)."

In reference to this issue the Court stated in *Corcoran,* supra:

"... That an injured worker is re-employed after an injury is a relevant factor to the determination of the extent of vocational disability, regardless of whether the employee returned to the same employment or to some other work. Nevertheless, this factor is not controlling and is only one of many that must be considered. Despite the employee's return to any employment, if the employee's ability to earn wages in any form of

employment that would have been available to him in an uninjured condition is diminished by an injury, then that is what is meant by vocational disability for the purpose of Workers' Compensation. The assessment of the extent of vocational disability is based on all pertinent factors taken together." 746 S.W.2d at 459.

Clearly, plaintiff's ability to compete for employment in the open labor market has been diminished as a result of his work related injury. The trial judge noted in his findings that you could look at plaintiff's arm and tell that it was not and never would be useful as a normal arm. Although he went to school to the 11th grade he has no work experience or training except as a common laborer. He had suffered a ruptured disc as a teenager. It is obvious that there are many types of employment which he is no longer able to perform. Counsel for the plaintiff argued that he had suffered seventy-five to eighty percent disability to his arm at the very minimum. Counsel for the defendant argued that he was entitled to no more than a twenty percent (20%) permanent partial disability rating because he had re-injured the arm at one of his subsequent employments. We find no evidence of that though plaintiff testified he did quit one job where he was required to use a pick and shovel because it caused numbness and a loss of strength in his arm. Considering all of the pertinent factors we conclude that the appropriate assessment of disability is somewhere in between the ratings argued for by counsel. We believe plaintiff's estimate of forty to fifty percent is most nearly correct. We set his degree of disability to his arm at fifty percent (50%).

■ The plaintiff argues that the trial judge miscalculated the award for temporary partial disability benefits due under T.C.A. § 50–6–207(2). Defendant concedes that the calculations were in error. Defendant also contends that plaintiff's temporary partially disabled condition came about by virtue of his unexplained refusal to undergo a surgical procedure recommended by his physicians in December, 1985. The operation was not performed until October, 1986, however there is no evidence in this record that he refused to submit to the surgical procedures. He had been discharged by Dr. Gaw to return to work. The employer in this case refused to re-employ him. In the interval he searched for other employment and did work at various jobs he was able to perform until it became apparent the operation was necessary for him to attain maximum recovery. We hold that plaintiff was entitled to temporary partial disability payments from 28 January 1986, the date of his last temporary total disability payment, through 17 October 1986 when his temporary total disability payments were reinstated. The statute is clear that the compensation shall be sixty-six and two-thirds percent (66⅔%) of the difference between the wage of the worker at the time of the injury and the wage he is able to earn in his partially disabled condition. Upon remand this compensation will be re-computed on the basis stated in the statute for the total number of weeks involved.

Plaintiff insists he is entitled to temporary total disability payments for the months of February, March and April 1986. We have held that he is entitled to temporary partial disability payments for that period of time. Those weeks are included in the calculation of temporary partial disability payments. He is entitled to either one or the other form of compensation, not both during the same term of disability.

■ There is an additional claim for $110 in medical expenses incurred during two periods of hospitalization. The first was at the time of plaintiff's injury and the second at the time of one of the subsequent surgical procedures. Plaintiff was placed in a private room. There is no evidence that this was done at his request. The employer's insurer declined to pay this additional cost. There is nothing in the record detailing the circumstances under which plaintiff was placed in a private room. The trial court disallowed this payment. T.C.A. § 50–6–204 provides that the employer or his agent shall furnish, among other expenses, hospitalization as may be *reason-*

*ably required.* (Emphasis supplied). In *Russell v. Genesco, Inc.*, 651 S.W.2d 206 (Tenn.1983) this Court held there should be a presumption that treatment furnished by physicians designated by the employer is necessary and the charges reasonable. The employer has the burden of persuading the court to the contrary. The defendant has not overcome that presumption in this case. The additional medical expenses are to be paid by defendant.

This cause is remanded with instructions to award permanent partial disability of fifty percent (50%) of the loss of use of plaintiff's arm and to recalculate temporary partial disability as directed herein. The hospital expense in the amount of $110 is to be paid by defendant. Costs to defendant.

HARBISON, C.J., and FONES, COOPER and DROWOTA, JJ., concur.